*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 11-CV-1206 and 11-CV-1208

DANIEL WOLF and MAIA CAPLAN KATS, APPELLANTS,

v.

SPRENGER + LANG, PLLC, *et al*., APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(CAB-1897-11 and CAB-1898-11)

(Hon. Michael L. Rankin, Trial Judge)

(Argued June 13, 2012                                        Decided July 11, 2013)
(Amended January 30, 2014)

*William R. Stein*, with whom *Michael A. DeBernardis* was on the brief, for appellant Daniel Wolf.

*Maia Caplan Kats*, pro se, who adopted the brief of appellant Wolf by reference.

*Gerald L. Maatman, Jr.* and *Daniel B. Edelman*, with whom *Rebecca S. Bjork* and *Stephen R. McAllister* were on the brief, for appellees.

Before WASHINGTON, *Chief Judge*, GLICKMAN, *Associate Judge*, and REID, *Senior Judge*.

REID, *Senior Judge*: This case concerns an arbitration in the District of

Columbia pertaining to the allocation of attorneys' fees awarded after a settlement

in a class action lawsuit that was filed and litigated in the Superior Court for the State of California, County of Los Angeles ("California trial court"). The arbitration involved several attorneys and law firms, most based in the District of Columbia. After receiving the arbitrator's award, appellants Daniel Wolf and Maia Caplan Kats unsuccessfully attempted to reopen the attorneys' fees issue in the California trial court. When that effort failed on jurisdictional grounds, Mr. Wolf and Ms. Caplan Kats filed a motion in the Superior Court of the District of Columbia ("District of Columbia trial court") to vacate the arbitration award on the ground that the arbitrator exceeded his powers and committed misconduct by denying them due process. Appellees Sprenger+Lang, PLLC ("S+L") and Jane Lang Paul Sprenger, LLC ("JLPS") opposed the motion. Mr. Wolf and Ms. Caplan Kats appeal the judgment of the trial court which denied their motion to vacate the arbitral award and confirmed the award. For the reasons stated in this opinion, we affirm the judgment of the trial court.[1]

---

[1] Following the issuance of the opinion in this case in July 2013, Mr. Wolf filed a petition for rehearing or rehearing en banc. Appellees S+L, JLPS, and Kator, Parks & Weiser, PLLC asked the court to deny the petition for rehearing en banc. However, S+L and JLPS were not opposed to the correction of a legal statement concerning whether the Superior Court was obligated to consider Mr. Wolf's argument that the arbitrator engaged in misconduct when the parties' arbitration agreement specified that the only ground on which the arbitrator's decision could be challenged was that he exceeded his powers. We granted Mr. Wolf's petition for rehearing and now issue a revised opinion. The revised opinion (1) states the legal principle that private parties have no authority to limit by

(continued…)

**FACTUAL SUMMARY**

The record shows that in 1999, Mr. Wolf, then a partner at the law firm of Hughes, Hubbard and Reed, LLP ("Hughes Hubbard") and Ms. Caplan Kats, then a partner at S+L, discussed and began to investigate the possibility of filing an age discrimination lawsuit on behalf of television writers over the age of 40 years. The discussion and investigation led to the execution of a Co-Counsel Agreement, in June 2000 ("the agreement"). Under the agreement, S+L agreed "to associate with" Mr. Wolf, Ms. Caplan Kats, and the law firm of Sprenger & McCreight, LC ("S+M") in order to represent plaintiffs in the class action. Paragraph 7 concerned the fee and expense petition. In pertinent part, Paragraph 7 required S+L to "submit a request for recovery of attorneys' fees and [e]xpenses that will include all hours reasonably expended at reasonable hourly rates and reasonable costs incurred by co-counsel in connection with the lawsuit for which contemporaneous records have been submitted." Paragraph 8 related to the allocation of recovered fees and expenses, and mandated, in relevant part, that "[a]ny . . . re-allocation of a

---

(…continued)

contract the statutory grounds set forth in the federal and the District of Columbia arbitration acts on which an arbitrator's decision may be vacated; (2) makes clear that the court considered and rejected Mr. Wolf's contention that the arbitrator engaged in misconduct; and (3) addresses and rejects Mr. Wolf's assertion that he raised an "arbitrability" issue in his appeal.

fee award . . . shall be based on each firm's percentage of the total lodestar fees in the litigation (reasonable hours worked times reasonable hourly rates) and any . . . re-allocation of an [e]xpense award shall be based on each firm's percentage of total [e]xpenses advanced in the litigation." Paragraph 11 of the agreement required "[a]ny dispute between the parties" to be resolved through arbitration, and that paragraph also limited the grounds on which an arbitrator's decision could be appealed: "The parties agree that no appeal of the decision of the arbitrator shall be taken unless the arbitrator has clearly exceeded the scope of his or her authority under this agreement." In Paragraph 10, the parties designated "the laws and Rules of Professional Conduct of the District of Columbia" as the governing law for the agreement.

Subsequently, due to changes in law firm affiliation,[2] S+L, KPW, AFL and

---

[2] Mr. Wolf, Ms. Caplan Kats, and Steven Sprenger affiliated with different firms after executing the agreement. When Hughes Hubbard decided not to participate in the writers' age discrimination class action, Mr. Wolf entered into an August 2000, independent contractor agreement with S+L reaffirming the applicability of the Co-Counsel Agreement to Mr. Wolf and determining the basis for his compensation. Mr. Wolf signed an employment agreement with S+L on May 1, 2001; he became a partner and his employment agreement provided for his compensation and other matters. Earlier, in mid to late 2000, Ms. Caplan Kats joined Kator, Parks & Weiser, PLLC ("KPW") as a partner, and Steven Sprenger became a partner at S+L after S+M dissolved. In addition, the AARP Foundation Litigation ("AFL") became part of the litigation team for the class action age discrimination litigation.

the local California law firm of Schwartz, Steinsapir, Dohrmann & Sommers ("SSDS") executed an Amended and Restated Co-Counsel Agreement on November 1, 2001 ("the amended agreement"). Paragraph 2 stated that the amended agreement "d[id] not . . . alter the terms of the agreement[] between S&L and Wolf . . . , nor the terms of the agreement between S&L and Caplan in connection with her departure from S&L, except to the extent, if any, expressly set forth" in the amended agreement. Under Paragraph 3, S+L had responsibility for common expenses such as court reporter fees and transcript costs, travel, and lodging. Paragraph 7 established the litigation Steering Committee, with Paul Sprenger as Chair; the Steering Committee also included Mr. Wolf, Ms. Caplan Kats, and Steven Sprenger.

Paragraphs 15 and 16 of the amended agreement were virtually identical to Paragraphs 7 and 8 of the June 2000 agreement. In part, Paragraph 15 required S+L to "submit a request for recovery of attorneys' fees and costs that will include all hours reasonably expended at reasonable hourly rates and reasonable costs incurred by the [law] [f]irms for which contemporaneous records have been submitted." Paragraph 16 further required that fees and expenses awarded by the court be combined and firms "reimburse[d] . . . for all costs incurred," and that the remaining "balance" be "allocate[d]" to each firm "in proportion to their

reasonable hours worked times reasonable hourly rates (lodestar fees)." Paragraph 19, like the comparable paragraph of the June 2000 agreement, designated "the laws and Rules of Professional Conduct of the District of Columbia" as the governing law. The arbitration provision of the amended agreement, Paragraph 22, was identical to Paragraph 11 of the June 2000 agreement. Paragraph 21 constituted a new provision: "No modification, termination or attempted waiver of this agreement shall be valid unless in writing, signed by the party against whom such modification, termination or waiver is sought to be enforced."

About three months after executing the amended agreement, the parties lodged twenty-three separate class action age discrimination complaints (involving hundreds of plaintiffs) against multiple defendants (networks and studios), in the California trial court. Thereafter, the parties engaged in protracted litigation, and in three years of mediation with mediators Hunter R. Hughes, Linda Singer and Judge Anthony Mohr. The California trial court orally approved the settlement of 19 cases on May 14, 2010 ("the Writers Litigation").

Around February and March 2010, the parties approved a mediation/arbitration agreement ("med/arb agreement") regarding their fees and expenses. They selected as mediator Mr. Hughes of Rogers & Hardin LLP, who

helped to negotiate the underlying settlement of plaintiffs' claims. The "non-binding mediation . . . concern[ed] all disputes, claims, or demands arising out of or related to the allocation among counsel of any fee and expense award arising out of the settlement of the 'Writers Litigation.'" The arbitration provision specified that "in the event that in the opinion of the [m]ediator the parties do not reach a settlement of all material issues in dispute, then all such unresolved issues shall be decided by the binding, nonappealable decision of the [m]ediator acting as an [a]rbitrator." Under the med/arb agreement, the mediator had "complete authority over all procedural matters."

The California trial court's January 6, 2009, and June 9, 2010, written approval of the settlements of the underlying litigation, meant that the parties had to turn their attention to filing an attorneys' fee petition prior to the mediator's issuance of his first order regarding procedural rules and other matters governing the proposed attorneys' fees arbitration. Even before the California trial court's settlement approvals, however, email traffic between the parties revealed a difference of opinion about billing rates for the purpose of allocation of fees. Around late October 2009, three attorneys sent a six-page memorandum to Paul Sprenger detailing "serious" issues regarding the allocation of fees. They concluded by declaring: "We will need to reach an agreement that these issues

will be preserved without prejudice to any party pending the outcome of the motion for preliminary approval, motion for attorneys' fees, and any mediation/arbitration of the fee issues." They added that in the event of non-resolution of these issues, they "will have to be raised with [the California trial] [c]ourt, which is something none of us would prefer to do."

Mr. Sprenger responded in an email, dated February 3, 2010, expressing the hope that discussion would resolve some of the fee issues. He continued: "In the event some differences remain after fully exploring resolution, I have had indications from everyone that mediation is the first alternative choice [a]nd that [Mr.] Hughes should be retained for that purpose." Paul Sprenger noted that he had "spoken to [Mr. Hughes] and he is willing to mediate any differences."[3]

---

[3] In the ensuing weeks, and as the April 5, 2010, date for the required filing of the fee petition in the California trial court grew closer, the parties' email traffic about fee issues did not subside. Paul Sprenger's email of March 19, 2010, to the parties, with a copy to Mr. Hughes, recognized their disagreement about "numbers." He endeavored to "assure everyone it will not prejudice anyone but rather [the fee petition would] be a straight forward request for the one-third contingency agreed upon by the named plaintiffs [in the settlement]." He "d[id] not expect the fee differences or [the] mediation to be mentioned." Three days later, with a copy to Mr. Hughes, Paul Sprenger again "assure[d] [the parties that] the [fee] request will not undercut or impact on mediation or arbitration but rather will justify an award to class counsel of a 1/3 fee and costs overall to be allocated pursuant to the co-counsel agreement and without individual amounts awarded to individual firm or lawyers." Furthermore, "the trustees [of funds awarded and paid over for fees and costs] will account to all counsel based on any allocation

(continued…)

Mediation was scheduled to start on March 11, 2010. In anticipation of that event, Mr. Hughes sent an email to all parties on February 17, 2010. He acknowledged "conversations or email exchanges with" Paul and Steven Sprenger, Ms. Lang, Mr. Wolf, and Ms. Caplan Kats "in an effort to begin to understand the nature and scope of the issues to be resolved." These exchanges prompted him to say that "the gap between the parties appears to be substantial and, based on [his] prior experiences, lawyers are often unwilling voluntarily to agree to a resolution of fee matters of this magnitude." Therefore, he "agreed with the suggestion that if this matter does not get settled by the end of the session on the 12th, then [he would] convert the mediation to a binding arbitration and decide any issue that remains open at that time."

The parties received two emails in April 2010, (April 7 and 9) on which Mr. Hughes was not copied. In the first, Mr. Lieder of S+L noted specific deficiencies in the declarations and sought to clarify what each party needed to put in his or her

---

(…continued)
agreement or final arbitration decision." The parties (copy to Mr. Hughes) received yet another email from Paul Sprenger on March 25, 2010. He asked that they "not calculate [their own] or anyone's lodestar." He stressed that he did not "want to calculate any percentage lodestar allocations or even multiply hours x rates to derive a lodestar," and that his "justification plan [for fees and costs] include[d] the use of median rates and total time by lawyers and legal assistants to reach a total over $25 million."

declaration in support of the fee petition. He asserted that the filers "will plug in the rates you [the parties] tell us in our compilation of all firms' rates," and that "if the rate you [the parties] wish to use for this purpose is different than the rate you are using for purposes of allocation among co-counsel, don't worry." The parties should not worry because Mr. Lieder "believe[d] that everybody has agreed not to use any rates requested in this fee application in the intra-counsel disputes over fees." In the second email, Paul Sprenger voiced a "need to see" the amended declarations "as [Mr. Lieder and Mr. Wolf] suggest[ed] they be filed." He expressed "no doubt that any mention of differences about fee entitlement in [the fee petition] papers going to defendants will result in the court deciding the fee issue," but that the parties "agreed that [Mr. Hughes] would decide those issues."

Paul and Steven Sprenger filed the twenty-page fee and expense petition in the California trial court on April 14, 2010, with supporting declarations from Mr. Wolf, Ms. Caplan Kats and others. The petition stated that "[e]ach declarant . . . has verified the hourly rates for all of the timekeepers in each firm or entity." The fee petition also justified the request for attorneys' fees under both the percentage of benefits and lodestar methodologies. In addition, it included the range of rates for partners or owners, associates, paralegals and legal assistants, and law clerks, and after "[s]umming the products of the hours times the rate for each timekeeper,"

the petition stated and justified "a total lodestar of about $41,170,000."

Following review of the fee and expense petition, the supporting declarations, and the responses of class counsel to the defendants' objections, and after applying both the percentage of benefits and lodestar methodologies, the California trial court determined that a one-third award of the settlement fund (with allocable interest) was fair, reasonable, and fully justified. The court concluded that by the time class counsel had completed all of the litigation work, the one-third award "will likely be only about 50% of their lodestar fees."

Sometime after the June 14, 2010, fee and expense petition approval by the California trial court, the parties again focused on the arbitration proceeding. The arbitrator issued an order on June 18, 2010, regarding procedural rules and preliminary matters. The order stated, in part, that "[t]he arbitral law shall be the Federal Arbitration Act." This order was followed by a preliminary telephonic hearing on July 13, 2010; the arbitrator issued a July 16, 2010, written report on the hearing. According to that report, the arbitration proceeding concerning the parties' claims was divided into two stages. Stage One claims focused on "the percentage allocation of Plaintiffs' fee arising out of the settlement of the 'Writers' Litigation'" – involving S+L, KPW/Caplan Kats, Mr. Wolf, JLPS and SSDS (with

a stipulation of the parties pertaining to the allocation to AARP and Mr. Edelman). Paragraph 2 (b) of the July 16 report stated: "The Parties stipulate, and the Arbitrator finds, that the claims in Stage One [described in the report] are arbitrable." Paragraph 2 (d), which related to Stage Two claims, provided: "The determination of individual counsel's allocations, specifically among S+L and [Mr.] Wolf; and S+L and [Ms.] Lang and [Mr.] Sprenger; and KPW and [Ms.] Caplan, is reserved for Stage Two, it being understood that the [a]rbitrator has made no findings at this time regarding the arbitrability of, and/or jurisdiction over, the claims reserved for Stage Two." Paragraph 3 of the report concerned the arbitral law; the parties stipulated that both the FAA and the law of the District of Columbia "shall govern the arbitral issues."

In September, 2010, the arbitrator sent two written questions to the parties relative to the construction and meaning of Paragraph 15 of the amended agreement (concerning the submission of the attorney fee petition to the California trial court, and including the language, "all hours reasonably expended at reasonable hourly rates and reasonable costs incurred"); and Paragraph 16 of the amended agreement (pertaining to the method for allocating the attorneys' fees and costs award among co-counsel, and defining the lodestar as "reasonable hours worked times reasonable hourly rates"). The key question posed by the arbitrator

stated: "Does any Party contend that the language referencing reasonable hourly rates and reasonable hours expended in Paragraph 15 has a different meaning than that comparable language in Paragraph 16. If so, state the basis for any such contention."

The parties' responses to the arbitrator reflected varying views relating to the allocation of the fee award. Mr. Wolf stated, in part: "[T]he parties all agreed that the filing of the fee petition in this case would be without prejudice to the rights of any party to challenge the reasonability [sic] of the hours and rates that had been submitted by any party." SSDS maintained that "the failure of a party to object to another party's fee submission under Paragraph 15 has no estoppel effect"; in support of that statement, SSDS quoted one of the emails from Paul Sprenger. Ms. Caplan Kats asserted that "to the extent one were to argue that the fee petition binds any subsequent determination under Paragraph 16 [of the amended agreement], it does not," because "it cannot be that the Sprenger Parties prevailed upon the non-Sprenger Parties to defer until arbitration any examination of unreasonableness, only to argue that such deferral bars determination here [in the arbitration proceeding]." JLPS took the position that "[n]othing in [Paragraph] 16 precludes an Arbitrator from adjusting rates either upward or downward in determining the attorney's 'reasonable hourly rate.'" S+L agreed, stating "the

Arbitrator may enhance the rates of one or more co-counsel under [Paragraph] 16 even if it was not done or sought under [Paragraph] 15."

Following discovery and filing of declarations, briefs, and other pleadings in the arbitration proceeding, the arbitrator issued his Stage One Allocation Order on December 13, 2010. In that order he examined and rejected, as inconsistent with the agreement and the amended agreement, the parties' argument that they had agreed that the filing of the fee petition in the California trial court would have no effect on the allocation of the fee award.

At the outset the arbitrator stated that "the award is a function of the governing law to the evidence of record"; and that the award "was not based upon general equity principles, pragmatic or other such factors that might play a role in the mediation of a dispute." (Emphasis in original). He declared that Paragraphs 15 and 16 of the amended agreement "can only reasonably be construed to mean that the lodestar fee amounts submitted to the [California trial c]ourt by each of the [f]irms in the fee petition in accordance with Paragraph 15 must be construed to be coextensive with, that is, be the same as, the lodestar fee amount of each [f]irm that is to be used to make the proportional allocation of the fee award under Paragraph 16." That is, to state the construction in another way: "the [p]arties agreed in

Paragraph 15 to provide the [c]ourt with reasonable hours and reasonable rates as a baseline upon which to make a fee award to them, and they correspondingly agreed in Paragraph 16 that those same hours and rates would constitute the basis upon which the [c]ourt's fee award – whatever it might be – would be proportionately allocated among themselves."

The arbitrator recognized that the parties differed as to the construction of Paragraphs 15 and 16, and that it could be argued that these paragraphs should be construed to mean that "the [p]arties' submission to the [c]ourt in the fee petition of their lodestar fees is of no moment to this dispute, as that submission was 'merely used to support a request for a contingent one-third fee award'"; and that "notwithstanding the [p]arties' having submitted to the [c]ourt their reasonable hours and reasonable rates via sworn declarations and a joint petition for the fee award, they 'in no way consented to the hourly rates and the number of hours presented by other law firms.'" Nevertheless, the arbitrator rejected that argument, saying in part: "As an initial proposition, when a [f]irm submitted to the [c]ourt its hours and rates, it unquestionably established that [p]arty's own lodestar in the sense that it cannot thereafter disavow the veracity of that filing." Furthermore, the arbitrator declared, "in filing each fee petition, the [p]arties did not just bind themselves to their own submissions." Rather, "[t]heir declarations join in and

support the fee petition and the petition itself is a <u>joint</u> fee petition" (emphasis in original), meaning that "by definition all [p]arties affirmed and consented to the other [p]arties' lodestar fees as set out in the joint petition," and no [p]arty could "later challeng[e] another [p]arty's lodestar fees in the allocation process." The arbitrator maintained that a construction of the amended agreement that would permit different hours and rates in the allocation proceeding "would bring into question the ethical propriety of the [amended] [a]greement itself" and "could subject the [amended] agreement to being voided as a violation of public policy." In addition, the arbitrator saw nothing in Paragraphs 15 and 16 that "authorize[d]" him "to enhance a particular [p]arty's lodestar." Furthermore, the arbitrator noted that "prior to submitting their joint [fee] petition, the [p]arties could have amended their [a]greement [under Paragraph 21 of the amended agreement] to establish a different allocation process that was not interlinked with the fee petition submissions, but they did not."

After taking into account "unreimbursed expenses" which had to be paid first, the arbitrator allocated the remaining amount of the fees and expenses fund as follows (preliminary percentages requested by the "parties," some of which were modified later in the parties' arbitration briefs, are in parentheses): S+L – 51.99% (74.06% minimum plus 15% enhancement), JLPS – 19.88% (27.5%, including a

33% enhancement for Paul Sprenger), KPW/Caplan Kats – 10.45% (Caplan Kats – 14 to 20%), Mr. Wolf – 8.73% (12.75%), SSDS – 7.70% (12.30%), AARP – 1.00%, and Daniel Edelman - .25%. The allocation order provided that the combined 1.25% allocated to AARP and Mr. Edelman, "shall be pro-rated between the remaining [p]arties that participated in the arbitration."[4]

---

[4] Before any briefs were filed for the Stage Two arbitration process, Ms. Caplan Kats filed an *ex parte* motion in the California trial court in late December 2010, seeking to stay disbursement of the fee awards and apparently stating her intent to file a motion to reopen the California trial court's order awarding fees and costs; and in early January 2011, Mr. Wolf filed a pleading in the same court challenging the rates and hours that had been submitted in the petition for attorneys' fees. On January 6, 2011, the California trial judge held a hearing regarding the papers filed by Ms. Caplan Kats and Mr. Wolf. Ms. Caplan Kats leveled accusations against S+L, including an allegation that in the fee petition submitted to the California trial court, S+L's "fees are exaggerated by at least 100 percent"; that "fraudulent statements have been made to [the California court]" or "misstatements"; and that the fee petition submitted to the California trial court "is dishonest." When the judge said to Ms. Caplan Kats, "[y]ou're claiming that there are misrepresentations to the [c]ourt, you knew them and you participated in making them to me," Ms Caplan Kats responded: "No, your Honor. I did not fully understand them until the arbitration process." Mr. Wolf explained that the intent of his pleading was "to alert the [c]ourt of the existence of allegations of excess with regard to the lodestar." Steven Sprenger announced that he "st[oo]d 100 percent behind the declarations in support of the fee[] [petition]," and Paul Sprenger claimed that the arbitrator had rejected the allegations that Ms. Caplan Kats and Mr. Wolf were making. David Weiser of KPW stated that his "firm was not thrilled with the result of the arbitration" but that "it is conclusive" and the California trial court did not have jurisdiction. After questioning the parties and observing that she had not received a copy of the arbitrator's award, the California trial judge declared that she saw nothing showing that "the fees that [she] awarded were not appropriate for the amount of work . . , done on [the class action] case"; that she did not believe she had jurisdiction, and that even if she did, she would "not exercis[e] it because lawyers, sophisticated people, entered into an arbitration

(continued…)

Mr. Wolf submitted a Stage Two arbitration brief to the arbitrator on February 10, 2011. Both Mr. Wolf and S+L transmitted other papers to the arbitrator prior to the date on which the arbitrator closed the record, February 22, 2011. Some papers were submitted after the closing date, including papers from Mr. Wolf, S+L and Ms. Caplan Kats. The arbitrator read the submissions, except for a March 15 filing which he only scanned. However, the arbitrator based his Stage Two order "solely upon the parties' submissions prior to the closing of the record." As indicated earlier, Stage Two of the arbitration process involved "[t]he determination of individual counsel's allegations, specifically among S+L and [Mr.] Wolf; and S+L and Jane Lang and Paul Sprenger; and KPW and [Ms.] Caplan." The arbitrator had reserved decision pertaining to the arbitrability of those claims and/or his jurisdiction over them.[5]

---

(…continued)
agreement in another jurisdiction and have availed themselves of that process." Hence, the judge said, if the parties believed that the "arbitration award was done by fraud or something was done wrong," the arbitration award should be contested where the arbitration occurred and in accordance with the arbitration process there.

[5] During the January 6, 2011 hearing before the California trial court, Ms. Caplan Kats took issue with the judge's statement that she, the judge, had a declaration from KPW that the attorneys' fees awarded would go to KPW. Ms. Caplan Kats insisted that the judge's statement was "false" and that the arbitrator ruled that the attorneys' fees award "goes to [KPW and Ms. Caplan Kats] jointly until a further arbitration." She took no issue with the arbitrability of and the arbitrator's jurisdiction over at least her dispute with KPW as part of the Stage Two arbitration process. Nor did Mr. Wolf challenge the arbitrability of and the

(continued…)

In mid-March 2011, prior to the arbitrator's Stage Two order, Mr. Wolf and Ms. Caplan Kats filed separate motions for partial vacatur of the arbitrator's award in the Superior Court of the District of Columbia.[6] They set forth identical reasons for their motion, maintaining that the arbitrator (1) "exceeded his authority in violation of section 10 (a)(4) of the FAA [Federal Arbitration Act] and section 16-4423 (a)(4) of the RUAA [District of Columbia Revised Uniform Arbitration Act]," and (2) "committed misconduct prejudicial to [their] rights, refused to

---

(...continued)

arbitrator's jurisdiction over his dispute with S+L pertaining to his attorney's fees. In fact, in his Stage Two arbitration brief, Mr. Wolf contended that under his independent contractor and employment agreements with S+L, he was entitled to an upward adjustment of his Stage One award, and that his Stage Two adjusted award should reflect a rate of $800 per hour rather than an hourly rate of $686, or in the alternative, he should receive "approximately $110,000 in additional compensation above and beyond [his] Stage One award." He also claimed that the Stage Two award should include "the lodestar fees attributable to the hours" worked by paralegals at his former firm, Hughes Hubbard. The arbitrator's two-page Stage Two award, issued on March 23, 2011, summarily rejected Mr. Wolf's claim to a higher rate in relation to S+L counsel, but granted his claim concerning the Hughes Hubbard paralegals and awarded Mr. Wolf $28,200 for that claim.

[6] In his Memorandum of Points and Authorities in support of his motion for partial vacatur of arbitral award, Mr. Wolf mentioned in a footnote that the Stage Two proceedings "are now complete and awaiting a decision by Arbitrator Hughes." In their opposition to Mr. Wolf's motion for partial vacatur, submitted to the trial judge's chambers, S+L and JLPS said, "on March 23, 2011, the Arbitrator issued a Stage Two Order . . . , granting in part and denying in part [Mr.] Wolf's claim to reduce S+L's share of the allocation made to him under the Stage One Award." A copy of the Stage Two award apparently was attached to the declaration of an attorney representing S+L in the District of Columbia trial court. Hence, our trial court was aware of the Stage Two arbitration order prior to rendering its August 2011 judgment.

consider evidence and argument material to the controversy and otherwise denied [them] the right to be heard in violation of section 10 (a)(3) of the FAA and sections 16-4423 (a)(2)(C) and 16-4423 (a)(3) of the RUAA." S+L, SSDS, KPW, and JLPS lodged responsive pleadings. After reviewing the record and examining case law applicable to the court's limited review of an arbitration award, the District of Columbia trial court signed an order on August 23, 2011, denying the motions for partial vacatur and confirming the arbitrator's December 13, 2010, arbitral award. Mr. Wolf and Ms. Caplan Kats noticed appeals.

## ANALYSIS

Mr. Wolf contends (Ms. Caplan Kats incorporates all of the arguments of Mr. Wolf) that before arbitration, the parties agreed that the filing of the fee petition in the California trial court would have no effect on their fee allocation dispute; hence, that was a resolved issue that was beyond the scope of the arbitration proceeding. Moreover, he asserts, each party further agreed that its respective challenges to the attorney fee hours and rates claimed by another party would be resolved during the arbitration proceedings; nevertheless, the arbitrator addressed the resolved issue (the effect of the attorney fee petition on the allocation of fees) and failed to consider the unresolved issue (the disputes about the parties'

claimed hours and rates).  Relatedly, Mr. Wolf argues that the trial court failed to address his arguments that "the arbitrator (1) committed 'misconduct' within the meaning of section 10 (a)(3) of the FAA, and (2) exceeded his powers within the meaning of section 10 (a)(4) of that Act."  He maintains that his due process right was violated because "at no point prior to issuing his [decision] did the [a]rbitrator himself ever suggest that his decision might turn on the filing of the fee petition and  some kind of (purportedly) contractually-derived estoppel[] rule" about which the arbitrator failed to give him notice and an opportunity to be heard.

In addition, Mr. Wolf states, as he did in the District of Columbia trial court, that the arbitrator exceeded his authority because (1) the arbitral award was based on the amended agreement which did not apply to him, and specifically, Paragraph 21 of the amended agreement precluding "modification, termination or attempted waiver . . . unless in writing, signed by the party against whom such modification, termination or waiver is sought to be enforced"; and (2) the arbitral award was based on the arbitrator's "own notions of 'ethical propriety'" rather than on the construction of Paragraphs 7 and 8 of the co-counsel agreement which contain "nothing . . . dictating or even implying that the lodestar the parties assert in connection with the filing of the fee petition and the lodestar that is used in the fee allocation process must be the same."

S+L and JLPS emphasize "the extremely narrow scope of judicial review" of an arbitration decision and award and insist that Mr. Wolf's and Ms. Caplan Kats' contentions "rest[] on a patent mischaracterization of the award." They assert that "[a]ppellants refuse to acknowledge that a motion to vacate must be denied <u>if any possible reading reflects that the award rests on the arbitrator's construction of the parties' agreement.</u>" (Emphasis in original). S+L and JLSP contend that the arbitrator did not exceed his authority or engage in misconduct, and that his award is based on his construction of Paragraphs 15 and 16 of the amended agreement and Paragraphs 7 and 8 of the 2000 co-counsel agreement. In addition, they maintain that Paragraph 1 of the amended agreement "superseded prior agreements, including the June 2000 [co-counsel agreement]"; therefore, under Paragraph 21, the amended agreement "could be modified only through a new written agreement between all of the parties." In addition, S+L and JLPS maintain that Mr. Wolf's and Ms. Caplan Kats' arguments about the arbitrator's award being based "on his own views of 'propriety and good policy' are "vague and conclusory" or "nothing more than speculation and conjecture." They insist that the arbitrator "based the [a]ward on his construction of" the co-counsel and amended agreements rather than any "estoppel[] finding."

We conduct a *de novo* review of a trial court's judgment confirming an

arbitration award, but our review is "extremely limited, and a party seeking to set [the judgment] aside has a heavy burden."[7] *Bolton v. Bernabei & Katz, PLLC*, 954 A.2d 953, 959 (D.C. 2008) (internal quotation marks and citations omitted). Under federal standards, a party also "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 (2010). "[We] will not set aside an arbitration award for errors of either law or fact made by the arbitrator." *Bolton*, *supra*, 954 A.2d at 959 (internal quotation marks and citation omitted). "It is only when [an] arbitrator strays from interpretation and application of the agreement . . . that the decision may be unenforceable." *Stolt-Nielsen*, *supra*, 130 S. Ct. at 1767; *see also COBEC Brazilian Trading & Warehousing Corp. of United States v. Isbrandtsen*, 524 F. Supp. 7, 9 (S.D.N.Y. 1980) ("An arbitration award will not be vacated for a mistaken interpretation of the contract or of the law, even when, in the court's view, the arbitrator['s] opinion was clearly erroneous both in logic and result.") (internal quotation marks and citations omitted). Thus, "the scope of judicial review for an arbitrator's decision is among the narrowest known at law

---

[7] After reviewing the legislative history of amendments made to the District's Arbitration Act in 2007, "we conclude[d] that neither the National Conference of Commissioners on Uniform State Laws . . . , nor the Council of the District of Columbia, intended that the revised provisions of the Uniform Arbitration Act . . . , would convert limited judicial review of the award to a *de novo* judicial merits review of claims made in arbitration proceedings." *A1 Team USA Holdings, LLC v. Bingham McCutchen LLP*, 998 A.2d 320, 323-24 (D.C. 2010) (footnote omitted).

because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all – the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." *MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 857 (4th Cir. 2010) (internal quotation marks and citation omitted); *see also Bolton*, *supra*, 954 A.2d at 959 ("limited review serves to attain a balance between the need for speedy, inexpensive dispute resolution, on the one hand, and the need to establish justified confidence in arbitration among the public, on the other") (internal quotation marks and citation omitted).

The standards and principles articulated above were emphasized in the Supreme Court's recent decision in *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064 (2013). There the Court declared that "the sole question for [a court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Id*. at 2068. Thus, "'[i]t is not enough . . . to show that the [arbitrator] committed an error – or even a serious error.'" *Id*. (quoting *Stolt-Nielsen*, *supra*, 130 S. Ct. at 1767. Moreover, "[u]nder the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.'" *Id*. (citation omitted)). Where the complaint is that the arbitrator exceeded his powers under the FAA, "[o]nly if 'the arbitrator act[s] outside the scope of his contractually delegated authority' – issuing an award that 'simply reflect[s] [his]

own notions of [economic] justice' rather than 'draw[ing] its essence from the contract' – may a court overturn his determination." *Id*. (citation omitted).

The parties in this case stipulated that the "[FAA], and [t]he law of the District of Columbia shall govern the arbitral issues." Based upon the parties' arguments, the pertinent parts of the FAA are 9 U.S.C. §§ 10 (a)(3) and (4) (2006), which provide:

> In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

The comparable parts of the District of Columbia's Revised Uniform Arbitration Act ("RUAA") are D.C. Code §§ 16-4423 (a)(2)(C) and (a)(4), which specify:

Upon motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if: . . .

(2) There was: . . .

(C) Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding; . . . [or]

(4) An arbitrator exceeded the arbitrator's powers . . . .

Where the argument is that the arbitrator exceeded his powers, an arbitrator's decision may not be based solely on a determination regarding the parties' intent; nor may it be grounded solely on an arbitrator's "own conception of sound policy," because: "[T]he task of an arbitrator . . . is to interpret and enforce a contract, not to make public policy." *Oxford Health Plans LLC*, *supra*, 133 S. Ct. at 2070 (internal quotation marks and citation omitted). So, a court may not "rely on a finding that [the arbitrator] misapprehended the parties' intent," because "§ 10 (a)(4) [of the FAA] bars that course," and "permits courts to vacate an arbitral decision only when the arbitrator strayed from his delegated task of interpreting a contract, not when he performed the task poorly." *Id*. at *14 (citation omitted). Thus, "[u]nder § 10 (a)(4) [of the FAA], the question for a judge is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all." *Id*. at *16.

Misconduct under section 10 (a)(3) of the FAA usually involves the exclusion of pertinent and material evidence that deprives a party of fundamental fairness. *See Thian Lok Tio v. Washington Hosp. Ctr.*, 753 F. Supp. 2d 9, 18 (D.D.C. 2010). "In deciding whether the [arbitrator] denied [appellants] a fair hearing . . . the [c]ourt's review is 'restricted to determining whether the procedure was fundamentally unfair.'" *Foulger-Pratt Residential Contracting, LLC v. Madrigal Condos., LLC*, 779 F. Supp. 2d 100, 120 (D.D.C. 2011) (quoting *Bolton*, *supra*, 954 A.2d at 960 (citing *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 818 (D.C. Cir. 2007) ("Every failure of an arbitrator to receive evidence does not constitute misconduct requiring vacatur."))). "Misconduct . . . refers to misbehavior though without taint of corruption or fraud, if born of indiscretion." *Silicon Power Corp. v. General Elec. Zenith Controls, Inc.*, 661 F. Supp.2d 524, 536 (E.D. Pa. 2009) (internal quotation marks omitted). "[A]n error on the part of the arbitrator . . . must be . . . so gross as to amount to affirmative misconduct." *Howard Univ. v. Metropolitan Campus Police Officer's Union*, 519 F. Supp. 2d 27, 37 (D.D.C. 2007) (citation omitted), *aff'd* 512 F.3d 716 (D.C. Cir. 2008).

We now apply the governing law, standards and principles to the case before us. We begin with the basis on which the arbitrator's decision could be challenged

under the agreement and the amended agreement. Paragraph 11 of the agreement and Paragraph 22 of the amended agreement both provide that: "The parties agree that no appeal of the decision of the arbitrator shall be taken unless the arbitrator has clearly exceeded the scope of his or her authority under the agreement." Mr. Wolf faults the trial court for failing to consider his argument regarding the alleged misconduct of the arbitrator. We agree that the trial court should have considered Mr. Wolf's argument that the arbitrator engaged in misconduct, and that the arbitrator's award should have been vacated under 9 U.S.C. § 10 (a)(3). "Private parties have no power to alter or expand [the statutory grounds for review of an arbitrator's decision], and any contractual provision purporting to do so is, accordingly, legally unenforceable." *Kyocera Corp. v. Prudential-Bache T Services, Inc.*, 341 F.3d 987, 1000 (9th Cir. 2003); *see also Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008) (statutory grounds for vacating and modifying an arbitrator's award "are exclusive" and they "may [not] be supplemented by contract"); *Hoeft v. MVL Group, Inc.*, 343 F.3d 57, 66 (2d Cir. 2003) ("judicial review is not a creature of contract, and the authority of a federal court to review an arbitration award . . . does not derive from a private agreement"). We said in a footnote in the panel's July 2013 opinion that "[t]he record does not support [Mr. Wolf's] claim" that "the arbitrator's decision should be vacated because of misconduct by the arbitrator." In light of Mr. Wolf's

petition for rehearing or rehearing en banc, we discuss the misconduct issue in more detail below.

Our *de novo* review of the record satisfies us that the arbitrator did not engage in misconduct within the meaning of the federal and District of Columbia arbitration acts. In his appeal brief, Mr. Wolf appeared to contend that the arbitrator failed to give him notice and denied him the opportunity to address "the filing of the fee petition and some kind of (purportedly) contractually-derived estoppel[] rule" applied by the arbitrator. Mr. Wolf's petition for rehearing or rehearing en banc attempts to enhance his appeal argument, and even asserts an issue that was not raised in his appeal brief. He claims that misconduct is not "limit[ed] . . . to the exclusion of material evidence," and that "[t]here is, after all, no meaningful difference from the standpoint of fundamental fairness between an order that directly prohibits a party from proffering material evidence and an order that resolves an arbitration on the basis of an argument that was never raised by any of the parties (or the arbitrator)." Furthermore, he insists that "no one ever argued that, under the terms of the Co-Counsel Agreement or otherwise, the hours and rates that each party submitted to the California court were controlling for purposes of determining each party's relative share in the allocation"; and that "[h]ad the parties or the Arbitrator ever raised that argument, [he] would have

proffered to the Arbitrator" certain evidence, and would have argued that "the parties had agreed to limit the scope of the arbitration such as to deny the Arbitrator any authority to make his allocation decision on the basis of the hours and rates submitted to the California court."

Generally, a misconduct challenge is grounded in the arbitrator's exclusion of pertinent and material evidence that deprives a party of fundamental fairness. *See Thian Lok Tio*, *supra*, 753 F. Supp. 2d at 18. Not only do we discern no evidence of misconduct on this record, but we also reject Mr. Wolf's belated effort in a petition for rehearing or rehearing en banc to raise an issue that was not presented to the Superior Court, or in his appeal brief in this court.[8] As we discuss

---

[8] Mr. Wolf states in his petition for rehearing or rehearing en banc that his "challenge was [not] to the Arbitrator's interpretation of his Co-Counsel Agreement," but that he "challenged *arbitrability*." The record simply does not support this belated assertion. From the outset of this case, Mr. Wolf couched his arguments and statement of issues not only in terms of the arbitrator's interpretation of his co-counsel agreement, or the parties' agreement, but also in terms of whether the arbitrator exceeded his powers or engaged in misconduct within the meaning of the federal and District arbitration acts. His motion for partial vacatur of the arbitrator's award specified two grounds: (1) the arbitrator "exceeded his authority. . . ." and (2) the arbitrator "committed misconduct prejudicial to [his] rights. . . . Mr. Wolf's statement of each issue set forth in his appellate court brief began "Did the arbitrator exceed his arbitral authority," and in the case of one issue, "and engage in procedural misconduct warranting vacatur of the award." The word "arbitrability" does not appear in the statement of issues. The Supreme Court has made clear that not every "potentially dispositive gateway question [is] a 'question of arbitrability'"; rather, "the phrase 'question of

(continued…)

below, the arbitrator obviously considered the fee petition filed in the California

trial court, as well as the basis for that petition as set forth in the parties' co-

counsel agreements; and in construing the pertinent provisions of the co-counsel

---

(…continued)

arbitrability' has a far more limited scope," and includes issues such as "whether the parties are bound by a given arbitration clause," "whether an arbitration agreement survived a corporate merger and bound the resulting corporation," and "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002). In addition, the word "arbitrability" does not appear in any of the topic headings of Mr. Wolf's main brief or reply brief on appeal, and the question of "arbitrability" is not explicitly discussed in either brief. Consequently, the panel was never faced with the issue of arbitrability. *See Oxford Health Plans LLC*, *supra*, 133 S. Ct. 2068 n.2. ("We would face a different issue if Oxford had argued below that the availability of class arbitration is a so-called 'question of arbitrability.'"). Moreover, the arbitrator sent the parties a procedural order on June 28, 2010, before the arbitration proceeding commenced, advising that the arbitration would be divided into two stages. Stage One related to the percentage allocation of the fee award to the respective parties. For Mr. Wolf and Ms. Caplan Kats, Stage Two appeared to be critical since it called for "[t]he determination of individual counsel's allocations, specifically among S+L and [Mr.] Wolf, and S+L and [Ms.] Lang and [Mr.] Sprenger; and KPW and [Ms.] Caplan." At that point, Mr. Hughes had "made no findings . . . regarding the arbitrability of, and/or jurisdiction over, the claims reserved for Stage Two." Hence Mr. Wolf and Ms. Caplan Kats were given the opportunity to present their case to the arbitrator concerning the individual allocation of fees to them, as well as their views about the arbitrability of Stage Two claims. The arbitrator set the deadline for Stage Two documents for February 22, 2011. Mr. Wolf made a timely initial submission, but Ms. Caplan Kats did not. Mr. Wolf's brief contained no argument regarding arbitrability. Both appellants lodged pleadings after the deadline had passed; the arbitrator generally read them but did not consider them in reaching his Stage Two decision. Even so, the arbitrator resolved one issue favorably to Mr. Wolf. That issue related to paralegals who had worked with him at his former law firm. Mr. Wolf received a $28,200 award in Stage Two for the paralegals.

agreements, the arbitrator specifically sought the views of the parties. Consequently, Mr. Wolf not only had the opportunity to present whatever evidence and arguments he desired to make, but he also submitted a response to the arbitrator's inquiry. Yet, he now asks this court to declare that the arbitrator committed misconduct because the parties denied him "any authority to make his allocation decision on the basis of the hours and rates submitted to the California court."

Given the duty of the arbitrator to interpret the parties' co-counsel agreements, and the opportunity given to the parties to present their views, we see no misconduct or prejudicial error on the part of the arbitrator that falls within the federal or District arbitration acts. There is nothing in the record before us that manifests action on the part of the arbitrator that is "so gross as to amount to affirmative misconduct." *Metropolitan Campus Police Officer's Union*, *supra*, 519 F. Supp. 2d at 37. Nor do we see any "misbehavior" that is "born of indiscretion." *Silicon Power Corp.*, 661 F. Supp. 2d 536. In short, the record is devoid of any action on the part of the arbitrator that "so affect[ed] the rights of [Mr. Wolf] that it may be said that he was deprived of a fair hearing." *National Casualty Co. v. First State Ins. Grp.*, 430 F.3d 492, 498 (1st Cir. 2005).

We now turn to Mr. Wolf's argument that the arbitrator exceeded the scope of his powers. In light of the trial court's and this court's "extremely limited" review of an arbitrator's decision, *Bolton*, *supra*, 954 A.2d at 959, "the sole question" before the court in a challenge under 9 U.S.C. § 10 (a)(4), is "whether the arbitrator (even arguably) interpreted the parties' contract." *Oxford Health Plans LLC*, *supra*, 133 S. Ct. at 2068. There can be no doubt in this case that the arbitrator reached his decisions in Stage One and Stage Two of the arbitration proceeding after interpreting the parties' co-counsel agreements. Two months before his December 2010 Stage One decision, the arbitrator submitted two written questions to the parties regarding the meaning of key Paragraphs 15 and 16 of the amended agreement, which are virtually the same as Paragraphs 7 and 8 of the agreement.[9] These paragraphs controlled the content of the attorney fee petition submitted to the California court on behalf of attorneys representing litigants in the class action. Paragraph 15 required the submission of "all hours reasonably expended at reasonable hourly rates and reasonable costs incurred by the [law] [f]irms for which contemporaneous records have been submitted." Paragraph 16 served as the basis for an allocation of fee funds to the respective law firms; that allocation had to be made "in proportion to [the law firms'] reasonable hours

---

[9] Because these key provisions of the agreement and the amended agreement are virtually the same, Mr. Wolf's argument that the amended agreement does not apply to him is unavailing.

worked times reasonable hourly rates (lodestar fees)."

Not only did Mr. Hughes request the parties to submit their views as to how Paragraphs 15 and 16 should be interpreted, but he also considered these submissions, including Mr. Wolf's and Ms. Caplan Kats' assertions that, in essence, what was submitted to the California court in accordance with Paragraph 15, would not preclude a later challenge during arbitration to the reasonableness of the hours and rates given to the California court. Thus, Mr. Hughes' Stage One decision obviously construed Paragraphs 15 and 16 of the amended agreement. He concluded, in plain terms: "the parties agreed in Paragraph 15 to provide the [c]ourt with reasonable hours and reasonable rates as a baseline upon which to make a fee award to them, and they correspondingly agreed in Paragraph 16 that those same hours and rates would constitute the basis upon which the [c]ourt's fee award – whatever it might be – would be proportionately allocated among themselves." Still interpreting the amended agreement, Mr. Hughes observed that had the parties wanted a different allocation process, they could have further amended their agreement in accordance with Paragraph 21 of the amended agreement, but they did not, clearly suggesting that the pre-fee petition email communications among the attorneys regarding the impact of the submission of the fee petition, did not constitute an agreement or a meeting of the minds that satisfied

contract formation principles.[10]

In addition to squarely centering his arbitration decisions on the meaning of paragraphs in the amended agreement, Mr. Hughes asserted that "the award is a function of the governing law to the evidence of record," and the fee award to the law firms "was not based upon general equity principles, pragmatic or other such factors that might play a role in the mediation of a dispute." Mr. Hughes also directly addressed the parties' varying interpretations of Paragraphs 15 and 16. In doing so, he used language that Mr. Wolf and Ms. Caplan Kats attack as reflecting a decision based on the arbitrator's "own notions of ethical propriety." Mr. Hughes made two statements that undoubtedly prompted appellants' argument. First, he said: "As an initial proposition when a [f]irm submitted to the [c]ourt its hours and rates, it unquestionably established that [p]arty's own lodestar in the sense that it cannot thereafter disavow the veracity of that filing." Second, Mr. Hughes declared, to construe Paragraphs 15 and 16 of the amended agreement to allow allocation of fees based on different hours and rates from those presented to the California court, "would bring into question the ethical propriety of the [amended] [a]greement itself" and "could subject the [amended] agreement to

---

[10] The parties to a contract must reach agreement about "all material terms," and the circumstances must reflect their intent to be bound by those terms. *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238-39 (D.C. 1995).

being voided as a violation of public policy." Arguably, in making these statements, Mr. Hughes was mindful of Paragraph 10 of the agreement and Paragraph 19 of the amended agreement which provided that "the laws and Rules of Professional Conduct of the District of Columbia" would be "the governing law for the agreement." Consequently, Mr. Hughes appeared to have reasoned that that it would be improper and undoubtedly a violation of the canons of professional conduct for attorneys to make "affirmed or sworn" declarations to the California court concerning hourly rates and then to use different hourly rates for the same transactions in determining the allocation of fees among the respective law firms.[11]

We also are satisfied that the arbitrator arguably construed Mr. Wolf's independent contractor and employment agreements with S+L, in addition to the agreement and amended agreement discussed above. Mr. Wolf's Stage Two argument centered on what the arbitrator called his "bilateral agreements' with S+L. In his Stage Two decision, the arbitrator indicated that he had "read carefully

---

[11] Rule 8.4 (c) of the District of Columbia Rules of Professional Conduct provides that "[i]t is professional misconduct for a lawyer to [e]ngage in conduct involving dishonesty, . . . or misrepresentation." When Ms. Caplan Kats and Mr. Wolf returned to the California court following receipt of the arbitrator's Stage One decision to lodge complaints about the rates and hours submitted with the fee petition, the California judge said to Ms. Caplan Kats, "[y]ou're claiming that there are misrepresentations to the [c]ourt, you knew them and you participated in making them to me," suggesting a violation of ethical rules governing attorneys' behavior.

and considered" timely filed Stage Two pleadings. Mr. Wolf's Stage Two brief provided a detailed argument about his contractual entitlement to higher rates based on his independent contractor and employment agreements, as well as an implied covenant of good faith and fair dealing, S+L's rate increase practices, and historically adjusted rates. Under the arbitration principles which control our review, we see no basis on which to disturb the arbitrator's Stage Two decision rejecting Mr. Wolf's request for an additional fee award in the approximate amount of $110,000.

Whether Mr. Hughes was right or wrong in his reasoning is not a basis on which we may reject his arbitration award, because "[i]t is not enough to show that the [arbitrator] committed an error – or even a serious error," *Oxford Health Plans LLC*, *supra*, 133 S. Ct. at 2068, and "[we] will not set aside an arbitration award for errors of either law or fact made by the arbitrator." *Bolton*, *supra*, 954 A.2d at 959 (internal quotation marks and citation omitted). Moreover, on this record we cannot conclude that the arbitrator's Stage One and Stage Two decisions are based solely on his own "conception of sound policy," or solely on "[his] own notions of [economic] justice." *Oxford Health Plans LLC*, *supra*, 133 S. Ct. at 2068, 2070 (citations omitted). In sum, the record surely does not permit us to hold that Mr. Hughes "stray[ed] from interpretation and application of [the agreement and

amended agreement]" such that his "decision [is] unenforceable." *Stolt-Nielsen*, *supra*, 130 S. Ct. at 1767. "Because the parties 'bargained for the arbitrator's construction of their agreement[s],'" and because the arbitrator's decision "arguably constru[ed] or appl[ied] the contract[s]," those decisions "must stand, regardless of a court's view of [their] (de)merits." *Oxford Health Plans LLC*, *supra*, 133 S. Ct. at 2068 (citations omitted).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court denying appellants' motion to vacate the arbitral award and confirming that award.

*So ordered*.